Tina Wolfson, SBN 174806
*twolfson@ahdootwolfson.com*
Theodore W. Maya, SBN 223242
*tmaya@ahdootwolfson.com*
Bradley K. King, SBN 274399
*bking@ahdootwolfson.com*
Christopher E. Stiner, SBN 276033
*cstiner@ahdootwolfson.com*
AHDOOT & WOLFSON, PC
10728 Lindbrook Drive
Los Angeles, California 90024
Telephone: (310) 474-9111
Facsimile: (310) 474-8585

*Counsel for Plaintiffs*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## SAN FRANCISCO DIVISION

| | |
|---|---|
| SCOTT KRAVITZ and NATASHA SARAVANJA, individually and on behalf of all others similarly situated,<br><br>                          Plaintiffs,<br><br>      v.<br><br>SK ENERGY AMERICAS, INC.; SK TRADING INTERNATIONAL CO. LTD.; VITOL INC.; and DOES 1-50,<br><br>                Defendants. | Case No. 3:20-cv-03427<br><br>**CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE CARTWRIGHT ACT (CAL. BUS. & PROF. CODE § 16720, ET SEQ.) AND CALIFORNIA UNFAIR COMPETITION LAW (CAL. BUS. & PROF. CODE § 17200, ET SEQ.)**<br><br><br>DEMAND FOR JURY TRIAL |

Plaintiffs Scott Kravitz and Natasha Saravanja (collectively, "Plaintiffs"), acting individually and on behalf of all others similarly situated, bring this action for damages and equitable relief against Defendants SK Energy Americas, Inc. ("SK Energy"), SK Trading International Co. Ltd. ("SK Trading"), Vitol Inc. ("Vitol"), and Does 1-50 (collectively, "Defendants") for treble damages and equitable relief under the Cartwright Act, Cal. Bus. & Prof. Code § 16700, *et seq*., and the Unfair Competition Law, Cal. Bus. & Prof. Code § 17200, *et seq*.

## NATURE OF THE CASE

1. This is a class action brought against Defendants on behalf of all consumers who purchased gasoline at gas stations in the State of California between February 2015 and December 2017.

2. Defendants are gas and oil companies. In February 2015, an explosion occurred at a gasoline refinery in Torrance, California. At the time of the explosion, the Torrance refinery supplied about 10% of California's refined gasoline.

3. After the explosion, Defendants entered into contracts to sell refined gasoline in California and acted in concert to artificially raise the spot price—the prevailing price to purchase physical supplies—of gasoline through a complex series of coordinated trading activities, including: (1) engaging in sham transactions to obfuscate the true nature of the supply and demand dynamic in California's gasoline market; (2) trading with each other with the purpose and effect of creating spikes in the spot market price; and (3) entering into prearranged, unreported buy and sell transactions with each other to share profits from the scheme.

4. Gas prices in California have historically been approximately 30 cents a gallon more than the national average. Beginning immediately after the crisis precipitated by the Torrance refinery explosion, however, Californians paid a premium of well over 50 cents over the national average, and continued to do so until well after the explosion's effects on supply had dissipated.

5. Defendants' anticompetitive price manipulation caused Plaintiffs—and other California gas purchasers who make up the proposed class in this action—to pay supra-competitive prices for gas for many months after the market effects of the Torrance explosion subsided.

6. Defendants acted unlawfully for their own profit and to the detriment of gasoline purchasers statewide. All of these acts were committed in furtherance of an antitrust conspiracy to raise, fix, and maintain the published spot market price of gasoline, eliminate market risk, conceal the scheme, and share unlawfully gained profits.

7. Defendants and their co-conspirators caused the price of gasoline to increase above the price that would have prevailed in a transparent, competitive market. As a result, Plaintiffs paid anticompetitive overcharges on their gas purchases. Plaintiffs accordingly seek treble damages under California antitrust law for themselves and the Class of similarly situated purchasers.

## PARTIES

8. Plaintiff Scott Kravitz ("Plaintiff Kravitz") is a resident of San Francisco, California. Plaintiff Kravitz owns a real estate business, "Scott Kravitz Separate Property LLC," formed in Arizona with its principal place of business in San Francisco, California. Plaintiff Kravitz's real estate business requires extensive car travel to his properties. Plaintiff Kravitz purchased gas for his vehicle between February 2015 and December 2017.

9. Plaintiff Natasha Saravanja ("Plaintiff Saravanja") is a resident of San Francisco, California. Plaintiff Saravanja purchased gas for her vehicle between February 2015 and December 2017.

10. Defendant SK Energy is a California corporation with its principal place of business in Houston, Texas. During the relevant time period, SK Energy functioned as SK Trading's California trading operation.

11.     Defendant SK Trading is a South Korean corporation with its principal place of business in Seoul, South Korea. SK Trading is the parent of SK Energy International and the indirect parent of SK Energy.

12.     SK Energy and SK Trading are subsidiaries of SK Innovation Co., Ltd., a South Korean energy company with its principal place of business in Seoul, South Korea.

13.     The SK entities were principals, agents, alter egos, joint venturers, partners, or affiliates of each other, and in doing the acts alleged herein, were acting within the course and scope of that principal, agent, alter ego, joint venture, partnership, or affiliate relationship.

14.     Vitol is a Delaware corporation with its principal place of business in Houston, Texas. Vitol operates a trading firm and is a subsidiary of Vitol Holding, B.V., an international energy and commodities company based in the Netherlands.

15.     DOES 1-50 are other individuals or entities that engaged in or abetted the unlawful conduct set forth in this complaint. Plaintiffs intend to seek leave to amend this complaint upon learning the identity of these Doe Defendants.

16.     Throughout the relevant time period, each Defendant was and is the agent of each of the remaining Defendants, and in doing the acts alleged herein, was acting within the course and scope of such agency. Each Defendant ratified and/or authorized the wrongful acts of each of the Defendants. Defendants are individually sued as participants and as aiders and abettors in the improper acts, plans, schemes and transactions that are the subject of this complaint. Defendants have participated as members of the conspiracy or acted with or in furtherance of it, or aided or assisted in carrying out its purposes alleged in this complaint, and have performed acts and made statements in furtherance of the violations and conspiracy.

## JURISDICTION AND VENUE

17.     This Court has jurisdiction over this action under the Class Action Fairness Act ("CAFA"), 28 U.S.C. § 1332(d) and 1367.  There are at least 100 members in the proposed class, the aggregated claims of the individual Class Members exceed the sum or value of $5,000,000.00 exclusive of interest and costs, and at least one member from the proposed class is a citizen of a state different from Defendants.

18.     This Court may exercise personal jurisdiction over Defendants because each, directly and/or through its ownership or control of subsidiaries: (a) transacted business in the United States, including in this District; (b) are registered to do business in the State of California; (c) had substantial aggregate contacts with the United States, including this District; and/or (d) engaged in anticompetitive acts that were directed at, and had a direct, substantial, and reasonably foreseeable and intended effect of injuring, the business or property of persons and entities residing in, located in, or doing business throughout the United States, including in this District. Defendants conduct business throughout the United States, including in this District, and have purposefully availed themselves of the laws of the United States.

19.     Venue is proper in this District under 28 U.S.C. § 1391(b), (c) and (d) because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this District, a substantial portion of the affected interstate trade and commerce was carried out in this District, and one or more of the Defendants do business in this District.

20.     Assignment to the San Francisco or Oakland Division is appropriate under Local Rule 3-2(c) because a substantial part of the conduct at issue in this case occurred in San Francisco County.

## FACTUAL ALLEGATIONS

### California is Unique:

21.     As the country's most populous state, and the state with the most licensed drivers and registered vehicles, California has a high demand for refined gasoline.

22.     In addition to having a significant need for refined gasoline, California's refined gasoline market is also unique compared to the bulk of the United States.

23.     California is distant from the oil refining hotbeds in Texas and the Gulf Coast, and because there are no pipelines linking California to petroleum or crude oil supplies, California must import its fuel from other domestic and international sources.

24.     California also has specific regulations that require special blends of refined gasoline and differentiated fuel standards. Under the California Reformulated Gasoline Regulations, refined gasoline consumed in California must be produced according to special, low-emissions specifications. As a result of these regulations, California's refined gasoline must meet the "California Reformulated Gasoline Blendstock for Oxygenate Blending, or "CARBOB" standard. Because California uses a special blend of refined gasoline, most CARBOB compliant gasoline is produced in California, and when there is a shortage of CARBOB compliant gasoline, it cannot be replaced by non-CARBOB refined gasoline.

25.     Because of the unique characteristics of California's refined gasoline market, Californians have historically paid approximately 30 cents extra per gallon of refined gasoline in comparison to drivers in other states.

26.     On February 18, 2015, a large explosion occurred at the ExxonMobil refinery in Torrance, California. The Torrance refinery is ExxonMobil's second smallest statewide, but it sells approximately 20% of the gasoline sold in Southern California and 10% of the gasoline sold state-wide.

27.     The explosion crippled the refinery, causing it to operate at a significantly reduced capacity, resulting in an unplanned shortage of refined gasoline meeting California's standards, affecting gas prices throughout the state.

28.     Because of the shortage caused by the Torrance refinery explosion, California's supply of CARBOB gasoline fell below the levels needed to satisfy demand. To make up for the shortfall, California had to rely more heavily on outside

sources of refined gasoline, like Defendants, sellers of gasoline and the components needed to refine it to satisfy California requirements.

**The Gasoline Trading Industry:**

29.    Fuel is traded on both physical or "spot" markets and paper or "futures" markets where traders purchase contracts to buy or sell gasoline at a future date.

30.    According to the Oil Pricing Information Service or "OPIS," the paper or futures market is run through the New York Mercantile Exchange, or NYMEX. Trades on NYMEX are anonymous, and guarantee counterparty performance.

31.    The paper market is used as a way to hedge (offset the risk of adverse price movements for) physical fuel purchases, and is a central factor in dictating downstream gasoline prices.

32.    OPIS defines spot fuel purchases as "fuel that is physically traded either on a pipeline or on the water (via barge)." It is called "spot" because traders can negotiate for the fuel "on the spot," and usually the product physically changes hands.

33.    The spot markets are located in hubs around the United States, with the West Coast hubs located in Los Angeles, San Francisco, and the Pacific Northwest.

34.    Spot price per gallon fluctuates and is linked to the NYMEX price per gallon. So spot transactions for refined products are not executed on a flat basis, but instead are executed based on a relationship to a related commodity on the NYMEX, called a differential to the cost basis.

35.    While NYMEX and the spot market are linked, local incidents like the Torrance explosion can affect the spot price.

36.    From the spot market, fuel is then distributed from a "rack," which is where fuel is supplied.

37.    Rack transactions are much smaller than spot transactions and are generally in "truck or trailer" quantities of approximately 8,000 gallons.

38.    Rack prices are directly linked to spot prices. And, if the fuel price influence chain is working as it should, when refiners have a need for more fuel, they

can make up the difference by purchasing on the spot market. The replacement gasoline purchased on the spot market is then sold on the rack. Per OPIS, "refiners increase or decrease their daily rack costs based on the average daily change in their spot replacement costs." Spot fluctuations are thus passed through to the rack costs.

39.    According to OPIS, the only charges included in a rack price are charges that are incurred from transporting fuel from the refinery to the distribution rack.

40.    Retail prices paid to gas stations for refined gasoline flow directly from the rack price, with federal, state, and local taxes added in, and with an additional margin built in.

41.    Because retail prices are linked directly to the rack price, which fluctuates based on the spot price, the spot price of refined gasoline dictates the price paid by consumers at the pump.

42.    In California, spot market trades for refined gasoline are conducted through private, over-the-counter trades. Prices, therefore, are not public. Instead, subscription price reporting services like OPIS publish weekly spot prices.

43.    Because many gasoline contracts use a floating price to be determined at a future date, the OPIS reported price determines the price of refined gasoline. OPIS obtains its price data directly from market participants, who submit their trading info to OPIS, which then derives a spot price by aggregating reported trading data. Thus, voluntarily reported trading data plays a critical role in dictating OPIS-reported daily spot prices.

44.    California spot market trading is governed by California's commodities fraud statute, which provides, among other things, that it is unlawful to "willfully employ any device, scheme, or artifice to defraud," in connection with the purchase or sale of commodity contracts. Corp. Code § 29536(a)–(d).

45.    The Federal Commodity Exchange Act similarly prohibits transactions that are: (1) "of the character of, or commonly known to the trade as, a 'wash sale' or

'accommodation trade'"; and (2) "used to cause any price to be reported, registered, or recorded that is not a true and bona fide price." 7 U.S.C. § 6c.

**<u>Defendants' Illegal Activities:</u>**

46.　Defendants actively traded refined gasoline in California during the Class period. Defendants both bought and sold spot contracts for refined gasoline, and imported gasoline and gasoline blending components into California during the Class period.

47.　SK Energy functioned as the California trading arm of SK Trading, but SK's West Coast trading business was conducted under the control and supervision of SK Trading, acting for itself and through its wholly owned subsidiary, SK Energy International.

48.　SK and Vitol employees had ample opportunities to collude throughout the duration of the wrongful conduct outlined in this complaint, via instant messaging, emails and telephone calls, as well as at in-person meetings, dinners, and drinks.

49.　Beginning in late 2014, Vitol and SK reached an agreement to coordinate their West Coast refined-fuel trading activities, including in California, and concealed their agreement from other market participants. This scheme to engage in concerted action was expanded in 2015 to include premium-refined gasoline.

50.　Immediately after the February 18, 2015 Torrance explosion, Defendants entered into agreements with one another and third parties in furtherance of a scheme to fix, raise, maintain and otherwise manipulate the price of refined gasoline in California.

51.　The scheme relied on various spot market trading tactics geared toward manipulating the OPIS reported spot price during pricing windows for large contracts in order to reap supra-competitive profits and limit risk.

52.　While Defendants used myriad trading tactics in furtherance of their scheme to inflate the OPIS reported price, the core of the scheme was: (1) engaging in trades at inflated values to manipulate the OPIS price; and (2) engaging in facilitating trades to disguise the scheme, limit market risk, and share profits with one another.

53.     Defendants' illicit trading activities designed to increase price included the following:

54.     **Inflating trades.** During key date ranges affecting pricing windows for large contracts, Vitol and SK engaged in transactions that they selectively reported to OPIS to increase and stabilize the OPIS-reported price. Defendants executed the transactions both directly and through intermediary brokers. These activities—including offers to buy and sell—were specifically intended to affect the OPIS-reported price.

55.     **Loss-leader transactions.** Defendants executed leveraged loss-leader transactions (low priced sales of a small quantity of product designed to attract customers). While Defendants took losses on the smaller amounts of gasoline sold at loss-leader prices, they did so to increase their profits on their sale of larger quantities of refined gasoline or alkylate during times when they had artificially inflated the OPIS-reported price.

56.     **High deal of the day trades.** Defendants executed market-inflating trades by intentionally bidding up the OPIS-reported price, often resulting in the market-spiking trade being the highest deal of the day. By making such "high deal of the day" trades, Defendants increased the average OPIS-reported spot price and gave market participants the false impression of sustained strong demand to further stabilize the high pricing.

57.     **First deal of the day trades.** Defendants also executed "first deal of the day" trades in which they made the first trade of the day at inflated prices during key pricing windows. Trading early in the day, at inflated prices, made it more likely that OPIS would report the inflated price trade to other market participants, again creating the false impression of artificially high demand and discouraging other participants from submitting offers below the price for the first deal of the day.

58.     **Premium market spiking trades.** Defendants executed abnormal market-spiking trades of premium with third parties and one another, increasing the market price of premium by ten cents or more in a day. The trades were effective given that

there are generally far fewer premium trades daily than regular trades. Defendants' collusive premium trades were designed to and did increase the price of alkylate, which is not a separately reported commodity on California's spot market, and whose price is thus commonly tied, with a small differential, to the OPIS-reported price for premium.

59.   **Reverse wash trades.** After an OPIS-reported trade, Defendants executed a second trade in the opposite direction of the OPIS-reported trade, distorting the perception of supply and demand and the bona fide spot price. Such trades would ensure that no gasoline actually would exchange hands as a result of the first, OPIS-reported trade that artificially drove up the OPIS-reported price. Such trades often were not reported to OPIS, so as to hide Defendants' market manipulation. These trades were pre-planned and mitigated risk by limiting the total exposure Defendants faced as a result of their panoply of manipulative transactions.

60.   **Preplanned short positions.** Defendants' wash trades could also occur before the OPIS-reported trade. For example, before an OPIS-reported pricing window, Defendants took pre-planned short positions, thereby locking themselves into buying during the relevant pricing window. When they went on to buy gasoline to increase OPIS-reported prices and cover their short position, other market participants saw an artificial increase in demand. Consequently, these short transactions were a key aspect of Defendants' scheme to control market pricing.

61.   **Unreported profit-sharing trades.** Defendants also executed unreported trades to share profits from their scheme. Vitol and SK entered into prearranged buy and sell contracts with each other to transfer money—not gasoline.

62.   Further, Defendants entered into agreements with each other to carry out this scheme that were described as "joint ventures" but which, in reality, were unlawful agreements to raise and fix prices in the California gasoline market and, through their conduct, to reap and share in windfall profits.

63.    Defendants' coordination began with regular gasoline in late 2014 and then expanded to include premium in February 2015. Later in 2015, Defendants expanded their agreements to cover alkylate.

64.    Under their alkylate agreement, Vitol or SK imported alkylate cargo and then colluded to increase profits from selling the alkylate at high prices while concealing their multifaceted cooperation.

65.    Defendants' agreements to coordinate gasoline-trading activities and to share the profits from alkylate cargoes also prevented competition between Vitol and SK for those products.

66.    Through their schemes, Defendants were able to capitalize on the Torrance explosion, inflate California retail gasoline prices above competitive levels, and maintain supra-competitive pricing until well after the Torrance refinery came back online in May 2016.

67.    While Defendants' conduct was directed at manipulating the spot price of refined gasoline, the spot price translates directly into the retail price of gasoline paid by California consumers. Thus, Defendants' conduct at issue caused California consumers like Plaintiffs to pay more for refined gasoline than they otherwise would have paid.

68.    Historically, California gasoline prices have hovered at around 30 cents a gallon more than the national average. When there have been similar incidents, such as the August 2012 fire at Chevron's refinery in Richmond, California, gas prices in California returned to their normal relationship with the U.S. national average within about four months. After the Torrance incident, California gas prices remained at levels substantially above the historic average through 2016 and into 2017.

69.    Whereas the spike in California gasoline prices in late 2012 caused by the Chevron refinery subsided by January 2013, after the February 2015 spike the California prices remained inflated at supra-competitive levels through 2016 and 2017.

**Defendants' Scheme Revealed:**

70.   After the Torrance explosion, the California Energy Commission sought analysis of these gas prices from its Petroleum Market Advisory group. That group, however, was under-resourced and unable to come up with an explanation. Even so, its final report noted the "unexplained differential" between prices in California and the national average that persisted even upon accounting for the unique features of the state's gasoline market. According to the report, "[u]nlike the Richmond/Torrance Refinery event, the differentials in 2015 Torrance Refinery event did not spike just once, but three times, roughly corresponding to increases in retail gasoline prices in California."

71.   The California Energy Commission report concluded that Californians might have paid at least $12 billion in extra gas costs due to the "unexplained differential" since the 2015 Torrance fire.

72.   On May 4, 2020, California Attorney General Xavier Becerra announced the filing of a lawsuit against Defendants for alleged manipulation of California's gas prices resulting in artificially inflated retail gasoline prices. The AG's suit alleges that Defendants seized on the market disruption caused by the Torrance refinery explosion to drive up gas prices and keep them at supra-competitive levels.

73.   The AG's suit alleges that Defendants engaged in market manipulation through trades that were:

> selectively reported to the Oil Price Information Service, LLC (OPIS)—the most widely used gasoline reporting service in California—in order to drive up the benchmark prices of Regular and Premium gasoline in OPIS's Spot Market Report. The companies, through two traders who were friends and former colleagues, colluded to drive up the price of OPIS-reported trades during pricing windows for large sales in order to increase the price of gasoline in the state to their profit. The firms engaged in unusual and otherwise irrational market-spiking trades with each other and third parties that had the effect of driving up prices prior to large trades—and they were

successful in doing so, artificially moving and inflating the price of Regular and Premium gasoline so effectively that the prices moved or stayed unaccountably higher than the supply and demand prevailing . . . . By driving up benchmark prices, the companies were able to sell their own product at a higher price, and inflate costs for consumers.

**Statute of Limitations:**

74.    Plaintiffs and Class Members had no knowledge of Defendants' combination or conspiracy, or of facts sufficient to place them on inquiry notice of the claims set forth herein during the Class period and continuing thereafter.

75.    Plaintiffs and Class Members purchased refined gasoline at prices that were artificially inflated as a result of Defendants' unlawful agreement to manipulate the California refined gasoline market. They had no direct contact or interaction with any of the Defendants in this case and had no means from which they could have discovered the combination and conspiracy.

76.    Throughout the Class period, and continuing thereafter, no information in the public domain was available to Plaintiffs and Class Members that revealed sufficient information to suggest that any of the Defendants were involved in an unlawful scheme to raise, fix, maintain and stabilize retail prices for refined gasoline.

77.    It was reasonable for Plaintiffs and Class Members not to suspect that Defendants were engaging in any unlawful anticompetitive behavior.

78.    Plaintiffs allege a continuing course of unlawful conduct by and among Defendants, including conduct within the applicable limitations periods. That conduct has inflicted continuing and accumulating harm within the applicable statutes of limitations.

79.    For these reasons, the statutes of limitations applicable to Plaintiffs' and Class Members' claims have been tolled with respect to the claims asserted herein.

80.    Additionally or alternatively, application of the doctrine of fraudulent concealment tolled the statutes of limitations on Plaintiffs' claims. Plaintiffs and Class

Members had no knowledge of the combination or conspiracy alleged in this complaint, or of facts sufficient to place them on inquiry notice of their claims, during the Class period and continuing thereafter. No information in the public domain or otherwise available to Plaintiffs and the Class during the Class period suggested that Defendants were involved in an unlawful scheme to artificially inflate and maintain refined gasoline prices in California.

81.    Defendants concealed their scheme by not disclosing that they were conspiring to manipulate California refined gasoline prices, and also through the obscure facilitating trading activity described herein. Defendants' scheme also was inherently self-concealing because, as Defendants knew, its disclosure would have led to governmental enforcement activity or civil liability. Refined gasoline is subject to antitrust and unfair competition law regulation, so it was reasonable for Plaintiffs and Class Members to presume that California refined gasoline was being sold in a competitive market. A reasonable person under the circumstances would not have had occasion to suspect that refined gasoline was being sold at supra-competitive prices at any time during the Class period.

82.    Because Defendants' scheme was self-concealing and affirmatively concealed by Defendants, Plaintiffs and Class Members had no knowledge of the conspiracy or of any facts or information that would have caused a reasonably diligent person to suspect a conspiracy existed during the Class period.

83.    Therefore, by operation of Defendants' fraudulent concealment, the statutes of limitations applicable to Plaintiffs' and Class Members' claims were tolled throughout the Class period.

## CLASS ACTION ALLEGATIONS

84.    Plaintiffs bring this lawsuit individually and as a class action on behalf all others similarly situated pursuant to Federal Rules of Civil Procedure ("Rule") 23(a), and/or (b)(3).  This action satisfies the numerosity, commonality, typicality, adequacy, predominance, and superiority requirements of Rule 23.

85.   The Class is defined as:

All persons who purchased refined gasoline at retail in California from February 18, 2015 until the effects of defendants' anticompetitive conduct ceased in December 2017 (the "Class period").

86.   Excluded from the Class are: (1) Defendants, any entity or division in which Defendants have a controlling interest, and its legal representatives, officers, directors, assigns, and successors; (2) the Judge to whom this case is assigned and the Judge's staff; and (3) federal government entities and instrumentalities, states and their subdivisions.

87.   <u>Numerosity</u>: Although the exact number of Class Members is uncertain and can only be ascertained through appropriate discovery, the number is likely to be in the millions and dispersed throughout the State of California such that joinder is impracticable.  The disposition of the claims of these Class Members in a single action will provide substantial benefits to all parties and to the Court.  The Class Members are readily identifiable from information and records in Defendants' possession, custody, or control.

88.   <u>Typicality</u>: The claims of the representative Plaintiffs are typical in that Plaintiffs, like all Class Members, purchased refined gasoline at retail in California between February 2015 and December 2017.  Plaintiffs, like all Class Members, have been damaged by Defendants' misconduct in that, *inter alia*, Plaintiffs purchased gasoline at an artificially inflated price.  Furthermore, the factual bases of Defendants' misconduct are common to all Class Members and represent a common thread of fraudulent, deliberate, and negligent misconduct resulting in injury to all Class Members.

89.   <u>Commonality</u>: There are numerous questions of law and fact common to Plaintiffs and Class Members that predominate over any individual questions.  These common legal and factual issues include the following:

a. Whether Defendants and their co-conspirators manipulated the market for the sale of refined gasoline in California;

b. Whether Defendants and their co-conspirators entered into agreements to set and maintain the price of refined gasoline in California by engaging in trading activity designed to artificially increase the refined gasoline spot price;

c. Whether Defendants had knowledge of the manipulation;

d. Whether Defendants took advantage of the manipulation to charge excessive, supra-competitive prices for the sale and distribution of refined gasoline in California;

e. Whether Defendants' conduct violates the Cartwright Act, Business and Professions Code section 16700 *et seq.*;

f. Whether Defendants' conduct violates the Unfair Competition Law, Business and Professions Code section 17200, *et seq.*;

g. Whether Plaintiffs and other members of the Class were injured in their business or property by reason of Defendants' unlawful conduct;

h. The measure of damages suffered by Plaintiffs and other members of the Class; and

i. Whether Plaintiffs and the members of the Class are entitled to restitution or other equitable relief under the Unfair Competition Law.

90.    <u>Adequate Representation</u>: Plaintiffs will fairly and adequately protect the interests of Class Members.  Plaintiffs have retained attorneys experienced in the prosecution of class actions, including consumer and product defect class actions, and Plaintiffs intend to prosecute this action vigorously.

91.    <u>Predominance and Superiority</u>: Plaintiffs and Class Members have all suffered and will continue to suffer harm and damages as a result of Defendants' unlawful and wrongful conduct.  A class action is superior to other available methods for the fair and efficient adjudication of the controversy.  Absent a class action, Class

Members would likely find the cost of litigating their claims prohibitively high and would therefore have no effective remedy at law.  Because of the relatively small size of Class Members' individual claims, it is likely that few Class Members could afford to seek legal redress for Defendants' misconduct.  Absent a class action, Class Members' injury cannot be remedied.  Class treatment of common questions of law and fact would also be a superior method to multiple individual actions or piecemeal litigation in that class treatment will conserve the resources of the courts and the litigants and will promote consistency and efficiency of adjudication.

**FIRST CAUSE OF ACTION**
**Violation of the Cartwright Act**
**Cal. Bus. & Prof. Code § 16720, *et seq*.**
**(Against All Defendants)**

92.    Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this complaint.

93.    Plaintiffs bring this cause of action individually and on behalf of the Class against Defendants.

94.    Commencing no later than the beginning of the Class period, and continuing thereafter uninterrupted, Defendants and their co-conspirators engaged in an agreement, trust, contract, combination or conspiracy to fix, raise, elevate, stabilize and maintain at supra-competitive levels the price of refined gasoline sold at retail in the State of California to Plaintiffs and members of the Class. The overt acts and practices in furtherance of this alleged agreement, trust, contract, combination or conspiracy include, among other things, the acts alleged above.

95.    The combination and conspiracy consisted of a combination, agreement, understanding and concert of action among Defendants and their co-conspirators, the substantial terms of which were to fix, raise, maintain and stabilize the retail price of refined gasoline sold in the State of California at supra-competitive levels.

96.   For the purpose of forming and effectuating the aforementioned combination and conspiracy, Defendants and their co-conspirators did those things which they agreed, and conspired to do, including among other things:

    a.   raising, fixing, stabilizing and maintaining the price of refined gasoline in California;

    b.   engaging in coordinated market-spiking trading activity in order to cause the spot price of refined gasoline to increase;

    c.   engaging in facilitating and wash trades in order to obfuscate market dynamics, conceal their scheme, and share profits;

    d.   reporting pricing information resulting from their unlawful trading activity to OPIS; and

    e.   entering into agreements to raise, fix, stabilize, and maintain the price of refined gasoline in California.

97.   In formulating and effectuating the agreement, trust, combination and conspiracy, Defendants and their co-conspirators committed the acts that they combined and contracted to do as part of their illegal scheme, including, but not limited to, discussing, exchanging, and deciding among themselves, and acting in accordance with their agreement to artificially inflate and maintain the price of refined gasoline in California.

98.   These activities resulted in a restriction of free competition among traders and sellers of refined gasoline and further resulted in Defendants and their co-conspirators earning substantially higher profits than they would have been able to earn in a competitive marketplace.

99.   Defendants' combination and conspiracy had the following effects, among other things:

    a.   buyers of refined gasoline were deprived of competitively priced refined gasoline;

b. competition for the right to buy refined gasoline was restrained, suppressed, and eliminated; and

c. the prices of refined gasoline were raised, fixed, and maintained at artificially high and anticompetitive levels.

100. Defendants' scheme constitutes a violation of the Cartwright Act.

101. As a direct and proximate result of the unlawful conduct of Defendants and their co-conspirators in violation of the Cartwright Act, Plaintiffs and Class Members were injured in their business and property in that they paid more for refined gasoline than they would have paid in the absence of this unlawful conduct. Thus, as a direct and proximate result of Defendants' conduct, Plaintiffs and the Class were damaged in an amount to be proven at trial, and Plaintiffs accordingly seek treble damages pursuant to section 16750(a) of the Act.

## SECOND CAUSE OF ACTION
### Violations of the California Unfair Competition Law
### Cal. Bus. & Prof. Code § 17200, *et seq.*
### (Against All Defendants)

102. Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this complaint.

103. Plaintiffs bring this cause of action individually and on behalf of the Class against Defendants.

104. California Business & Professions Code § 17200, *et seq.* ("UCL") prohibits acts of "unfair competition," including any "unlawful, unfair or fraudulent business act or practice" and "unfair, deceptive, untrue or misleading advertising."

105. Defendants, each of them, individually, and in concert, engaged in unfair and unlawful business practices within the meaning of Business and Professions Code sections 17200 *et seq.*

106. The unlawful, unfair and unconscionable business practices of Defendants, and each of them, as alleged herein, injured members of the public in that Defendants'

conduct restrained competition and caused Plaintiffs and the members of the Class to pay supra-competitive prices for refined gasoline.

107.   Defendants acted in an unethical, unscrupulous, outrageous, oppressive, and substantially injurious manner by, among other things:

    a) conspiring to fix, maintain, and stabilize the market for refined gasoline in California;

    b) engaging in unlawful and deceptive trading activities, including market spiking transactions and facilitating wash trades;

    c) reporting pricing information resulting from their unlawful trading activity to OPIS; and

    d) entering into agreements to raise, fix, stabilize, and maintain the price of refined gasoline in California.

108.   The acts and practices of Defendants, and each of them, as alleged herein, constitute unlawful and unfair business practices in violation of Business and Professions Code sections 17200, *et seq*. in that their conduct is immoral, unscrupulous, anticompetitive, and contrary to public policy, and the gravity of the conduct detailed herein outweighs any benefit attributable to such conduct.

109.   The acts and practices of Defendants, and each of them, as alleged herein, whether or not concerted or independent acts, violate Business and Professions Code sections 17200, *et seq*.

110.   The acts and practices of Defendants, and each of them, as alleged herein, directly and proximately caused Plaintiffs and each member of the Class to suffer injury in fact by paying supra-competitive prices for refined gasoline.

111.   Defendants have been unjustly enriched and should be required to make restitution to Plaintiffs and the Class.

### RELIEF REQUESTED

Plaintiffs, individually and on behalf of all others similarly situated, request the Court enter judgment against Defendants, and accordingly request that:

A. The Court determine that this action may be maintained as a class action under Rule 23(a) and (b)(3) and direct that reasonable notice of this action, as provided under Rule 23(c)(2), be given to each member of the Class;

B. That the Court declare and decree that Defendants and their co-conspirators have entered into an illegal trust, combination and/or conspiracy in unreasonable restraint of trade in violation of the Cartwright Act, and that Plaintiffs and the members of the Class were damaged and injured in their business and property as a result thereof;

C. That the Court award Plaintiffs and the members of the Class all compensatory and general damages determined to have been sustained by them as a result of Defendants' conduct as complained of herein, and that joint-and-several judgments be entered against each Defendant for the amount so determined along with the trebling of said damages;

D. That the Court award restitution through its equitable powers under the remedial provisions of Business and Professions Code § 17200, *et seq.*;

E. That the Court award pre- and post-judgment interest, reasonable attorneys' fees, and costs of suit, including expert witness fees; and

F. That the Court grant such other and further legal and equitable relief, including exemplary damages, as this Court may deem proper.

## DEMAND FOR JURY TRIAL

Plaintiffs, individually and on behalf of all others similarly situated, hereby demand a trial by jury as to all matters so triable.


Dated: May 20, 2020

Tina Wolfson, SBN 174806
twolfson@ahdootwolfson.com
Theodore W. Maya, SBN 223242
tmaya@ahdootwolfson.com
Bradley K. King, SBN 274399
bking@ahdootwolfson.com

Christopher E. Stiner, SBN 276033
cstiner@ahdootwolfson.com
AHDOOT & WOLFSON, PC
10728 Lindbrook Drive
Los Angeles, California 90024
Telephone: (310) 474-9111
Facsimile: (310) 474-8585

*Counsel for Plaintiffs*

CLASS ACTION COMPLAINT, CASE NO. 3:20-cv-03427